UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-61971-CIV-COHN

STEVE JEFFERSON,

Magistrate Judge Seltzer

    Plaintiff,

vs.

BURGER KING CORPORATION,

    Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Defendant's Motion for Summary Judgment [DE 27], Plaintiff's Response [DE 33], Defendant's Reply [DE 36], Plaintiff's Motion for Summary Judgment [DE 30], Defendant's Response [DE 31], and Plaintiff's Reply [DE 37].  The Court has carefully considered the motions and all related filings, and is otherwise fully advised in the premises.

**I.  BACKGROUND**

Plaintiff Steve Jefferson ("Plaintiff" or "Jefferson") filed this action against his former employer, Burger King Corporation ("Burger King" or "Defendant"), for race discrimination and retaliation under Title VII of the Civil Rights Act.  Plaintiff asserts claims for a failure to promote, retaliation, and disparate treatment (wrongful transfer and termination).  Plaintiff was employed by Defendant since at least 1991.  In 1993, Plaintiff was promoted to General Manager, a position he held until his termination on May 7, 2010.  From 2004 to mid-2009, Plaintiff was General Manager for two Burger King locations at the Sawgrass Mills Mall.[1]

---

[1] A "General Manager" is the same as a restaurant manager.  Plaintiff contends he was a multi-unit manager because he oversaw two locations at the Sawgrass Mills Mall.  Defendant contests the assertion that Plaintiff ever held the position of "Multi-Unit

In November of 2008, during a conference in Orlando of Burger King executives and General Managers from throughout the state of Florida, Plaintiff received a call at 2:00am from a fellow General Manager that the manager she was sharing a room with came back drunk with other drunken general managers, speaking loudly and engaging in sexual banter, forcing her to sleep in another room.  Plaintiff made a comment the next morning to his superior, Company Business Manager ("CBM")[2] Kelly Elliott, asking her if she heard what the managers did in Hilda's room last night.  Deposition of Steve Jefferson at 56-58 [DE 29-1].  Ms. Elliott told Plaintiff she would speak with the offending General Managers.  Id.

Plaintiff contends that this incident, as well as general discrimination against African American General Managers, led to his transfer from the Sawgrass Mills locations.  Burger King contends that in early 2009, Director of Company Operations Willie Romeo, along with his deputy, Marketing Manager Jesus Perez, decided to transfer a number of successful General Managers at restaurants that had reached their full sales potential to restaurants with high potential but poor sales.  On May 14, 2009, CBM Elliott informed Plaintiff of his transfer to Store #4235 in East Fort Lauderdale.  Plaintiff refused to agree.  On May 21, 2009, Plaintiff met with Perez and Elliott – Plaintiff states that the transfer is "discriminatory," but he does not mention race in that meeting.  Plaintiff contends that Elliott previously had mentioned race to him as a

---

Manager."

[2] A CBM is the equivalent to a district manager, overseeing seven to eight General Managers.  There are 14 CBM's in the South Florida market.  These CBM's report to two Marketing Managers, who in turn report to the Director of Company Operations for South Florida.

possible motive of Perez and Romeo, though Plaintiff believed Elliott was attempting to deflect scrutiny away from her after "the gay-sex incident months earlier at the Managers' Convention" in Orlando.  Plaintiff's Response at p.4.  Plaintiff again refused to agree and requested intervention by Human Resources.

On June 18, 2009, Plaintiff met with Barbara Rocha, Director of Human Resources and Romeo.  The parties dispute whether Plaintiff actually agreed to the transfer.  Plaintiff contends that Romeo stated that he would consider other options, leading to a delay in the transfer until mid-July.  On July 10 or July 17, Plaintiff transferred.  Burger King contends that within 45 days, Plaintiff had turned Store #4235 around, with substantial improvement in sales.  Plaintiff contends that the improvement had nothing to do with sales, but with the unit's score on an Operations Procedure review.

On July 27, 2009, Plaintiff filed a Charge of Discrimination because of the transfer.  Exhibit 14 to Deposition of Steve Jefferson [DE 29-3 at 97 of 148].  Plaintiff alleged discrimination based upon race, sex and retaliation.  The retaliation relates back to the November 2008 incident in Orlando, which Plaintiff contends involved a sexual hostile work environment and harassment.  Plaintiff contends that he complained at that time about it but nothing was done.  Plaintiff also alleges that his transfer was a demotion and was based upon his race (Black).

Between April 10, 2009 and August 14, 2009, around the same time as Plaintiff's transfer became effective, Burger King transferred at least eleven (11) other non-African American General Managers.  Exhibit E-25 to Plaintiff's Motion [DE 30-3, at 27 of 66].  Defendant points to these persons as evidence of its business decision to

transfer General Managers as part of an overall plan to boost sales.  Plaintiff contends that the vast majority of these transfers took place after his Charge of Discrimination was filed.

After his transfer, Plaintiff now reported to a new CBM, Brian Cunningham, allegedly a mentor of his prior CBM, Kelly Elliott.  In late March of 2010, Defendant received a complaint regarding working conditions at Plaintiff's restaurant.  This complaint led to an investigation at the location by Cunningham.  During his visit to the unit, Cunningham received at least nine different written employee complaints about Plaintiff's verbal abuse, use of profanity, violation of company policy with regard to removing employees from the work schedule in retribution for them calling in sick, among other issues.  Exhibits 1 to 14 of Declaration of Barbara Rocha (Exhibit C to Defendant's Statement of Facts) [DE 28-4].[3]  On April 29, 2010, Plaintiff met with Cunningham and Rocha regarding these complaints, though Rocha refused to identify the names of the employees or the specific nature of the complaints.  Jefferson Deposition at 212-216 [DE 29-2].  Following this meeting, during which Plaintiff denied any wrongdoing, Plaintiff then confronted his employees to determine who had

---

[3]  Plaintiff claims that the written statements of the employees are hearsay put forth by Barbara Rocha.  Plaintiff supports this argument by stating that during the EEOC investigation, none of the employees provided statements to the EEOC.  However, the written statements can be admissible under the business records exception of Federal Rule of Evidence 803(6).  The written statements were made at or near the time by someone with knowledge (the employees themselves, who signed (almost all) of the statements); the records were kept by HR in the course of a regularly conducted activity of Defendant; making such records (when a complaint is made) was a regular practice of HR; Barbara Rocha's declaration, as head of HR, is qualified to show these conditions; and there is no reason why the  employees would be untrustworthy.

complained.  Id. at 216 -217.  Plaintiff also viewed the store's surveillance video to determine which employees met with Cunningham on Plaintiff's day off.  Id. at 217-219.  Plaintiff was terminated one week later for violation of company policies.

Plaintiff sets forth additional facts explaining that he had applied over the years with Burger King for promotion to a Multi-Unit Manager position.  Burger King contends that it had phased out that position, and was no longer making promotions to that position, though Plaintiff has found a recruitment flyer from July 2009 that uses that term.  Exhibit B-7 to Plaintiff's Motion [DE 30-1, p. 14 of 72].  Plaintiff also contends that he had applied for a CBM position, and was passed over for that promotion in favor of non-black applicants.  With regard to the employee complaints, Plaintiff alleges that Brian Cunningham arranged these complaints to get Plaintiff fired because of Plaintiff's "complaint" made to Kelly Elliott.

## II. DISCUSSION

### A.  Summary Judgment Standard

Both parties have moved for summary judgment.  The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must point out to the Court that "there is an absence of evidence to support the non-moving party's case."

Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). According to the plain language of Federal Rule of Civil Procedure 56(e), "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [the Court may] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

At the summary judgment stage, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In making this determination, the Court must decide which issues are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

### B.  Race Discrimination

#### 1.  Disparate Treatment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. S 2000e-2(a)(1). A plaintiff may establish a prima facie case of discrimination either by "statistical proof of a pattern of discrimination," or "direct

6

evidence of discrimination, which consists of 'evidence which, if believed, would prove the existence of discrimination without inference or presumption,'" or by "circumstantial evidence to prove discriminatory intent, using the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973)." Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir.1997) (citations omitted).  In the usual case, direct evidence is not present and the plaintiff must rely on circumstantial evidence.  Id. at 1562.

Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) the plaintiff belongs to a racial minority;  (2) he was subjected to adverse job action;  (3) his employer treated similarly situated employees of other races more favorably; and (4) he was qualified to do the job.  Holifield, 115 F.3d at 1562 (11th Cir. 1997); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310 (11th Cir.1998).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562 (citations omitted).  If a prima facie case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."  Jones, 137 F.3d at 1311.  If this is done, then the plaintiff may attempt to show that the proffered reason was merely a pretext for the defendant's acts.  Id. at 1311; see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Id. However, "a plaintiff's prima facie case, combined with sufficient evidence to find that

the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2109 (2000).  Following Reeves, the Eleventh Circuit Court of Appeals held that "if the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000).

### 2.  Plaintiff Cannot Show Comparator for Either Claim

In this case, Plaintiff is black, allegedly suffered two separate adverse actions – transfer and termination, and was qualified to do the job (without considering whether the employee complaints regarding his verbal abuse disqualified him).  Thus, the remaining issue for Plaintiff's prima facie case on his race discrimination claim is to show that Defendant treated similarly situated employees of other races more favorably.

Plaintiff fails to meet the test of showing a nearly identical comparator of another race who was treated more favorably for either his termination or his transfer.  The Eleventh Circuit has stated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Id. (internal quotations and citations omitted).  We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and

> confusing apples with oranges. See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999).  In Maniccia, a sheriff's deputy was terminated for obtaining confidential driver's license information for an acquaintance for the private benefit of a corporation, for lying about this conduct, for transporting an unauthorized passenger without permission, and for lying about transporting this passenger.  Id. at 1366.  In opposition to defendant's motion for summary judgment, Maniccia put forth evidence of other sheriff's deputies not having been terminated for transporting unauthorized passengers, for lying, and for off-duty criminal charges.  The Eleventh Circuit upheld the grant of summary judgment because each of the comparators did not commit multiple offenses as Maniccia did, making them not "nearly identical."  Id. at 1369.  Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006) ("nearly identical" standard is controlling).

a. Adverse Action of Termination

Plaintiff attempts to compare his termination with the alleged lack of discipline given to white General Manager Gary Bandringa and Hispanic Assistant Manager Carlos Arbulu.  Plaintiff asserts that at store #6999 Bandringa "worked an employee as a slave in November 2009, terminated him [the employee], refused to pay him, and only confessed when 2 letters in May 2010 were sent to BKC's President complaining of the illegal activity."  Plaintiff's Response at p. 7.  According to Plaintiff's letter to Defendant's

President, dated May 10, 2010, it was Plaintiff who apparently brought this complaint regarding Bandringa. Plaintiff's Exhibit B-4 at p. 4; B-5 at p. 2 [DE 30-1, pp. 8, 11 of 72]. However, the volume of the complaints against Plaintiff dwarf the single complaint that one employee indirectly (helped by Plaintiff) made against Bandringa. In addition, the verbal abuse of multiple subordinates on multiple occasions is not nearly identical conduct compared to paying one employee "off the clock" for a week or two. While this Court in no way condones either behavior, each of which impacts its victims, as in Maniccia, the volume of complaints against Plaintiff makes Bandrings not "nearly identical," and therefore, not a valid comparator.

Plaintiff also asserts that Assistant Manager Carlos Arbulu, who is alleged in some of the same complaints against Plaintiff to have inappropriately touched female employees and stolen funds, and who Plaintiff alleges slept with an employee, is a valid comparator in that Arbulu was not terminated. Defendant contends that Arbulu is not a valid comparator because he was not a General Manager. In Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 -81 (11th Cir. 2008), the Eleventh Circuit reiterated the "nearly identical" standard in determining that a fire department Deputy Chief, two ranks higher than a Battalion Chief, could not use the lessor discipline meted out to a Battalion Chief (who had committed similar but somewhat different offenses) as a valid comparator. Defendant also argues that Plaintiff lacks personal knowledge about what discipline was taken against Arbulu, since Plaintiff was no longer with the company.

The Court concludes that under the Eleventh Circuit "nearly identical" standard, Plaintiff has failed to create a genuine issue of material fact that either Bandringa or

10

Arbulu is a valid comparator.  Therefore, Plaintiff has failed to set forth a prima facie case of race discrimination in his termination.

### b.  Adverse Action of Transfer

Plaintiff maintains that his transfer from Sawgrass Mills to East Fort Lauderdale was a demotion, and therefore an adverse action.  Defendant disputes this conclusion, since Plaintiff maintained his title of General Manager and performed the same duties.  Plaintiff contends that because he had earned $28,000 in bonuses over the prior 18 months at Sawgrass Mills, and because his bonus potential was now reduced, the transfer was a demotion in terms of salary.  In addition, Plaintiff argues that because he supervised two units at Sawgrass Mills, that he was effectively demoted from a multi-unit manager (a title that Defendant maintains Plaintiff never was given) to just a single unit manager.

"Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (citations omitted).  The Gupta decision used the standard that an adverse action "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Gupta, 212 F.3d at 587.  When applying this standard to the present case, the Court concludes that there is at least a genuine issue of material fact as to whether the transfer was an adverse action.

11

However, as with the above discussion of a whether Burger King treated similarly situated employees of other races more favorably, it is undisputed that several other non-black managers were transferred at the same time, or within a month or so, of Plaintiff's transfer. Plaintiff's Exhibit E-25 [DE 30-3 at 27 of 66]. Despite Plaintiff's conclusory arguments that his transfer alone was different because of his loss of bonus money, the fact remains that at least a dozen other non-black General Managers had effective transfer dates between April 10, 2009 and August 14, 2009. As we know from Plaintiff's own transfer, the effective transfer date is typically later than the decision date by management, in order to allow the General Manager time to either appeal the decision or move closer to the new location. Plaintiff's argument that all of these transfers were made to cover up Plaintiff's transfer is without credibility. There are no genuine issues of material fact that Plaintiff cannot show that non-black General Managers were treated more favorably, given how many were transferred near the same time as Plaintiff.

### 3.  Legitimate Business Reason and Lack of Pretext

Even if the Court were to conclude that Plaintiff had set forth a prima facie case for either his transfer or termination, Defendant has put forth a legitimate reason for both adverse actions. As discussed above, the transfer was made as part of Burger King's plan to move successful managers to units with high potential but poor sales. While Plaintiff maintains that this reason was simply a cover up to discriminate against Plaintiff, that accusation makes no sense given the high number of General Manager transfers made at or around the same time. As for Plaintiff's termination, as discussed

above, Defendant relied upon the written employee complaints of verbal abuse and related violations of Defendant's policies.

Plaintiff contends that with regard to his transfer, the stated reason is pretextual because his new store did not in fact have poor sales. However, the extensive transfers during the same time period belie any inference that Plaintiff was singled out for a demotion by transfer. The Court does not sit to evaluate the correctness of Burger King's business decisions – as long as Burger King management believed its transfers decisions were taken for business reasons, it does not matter if those were bad business decisions, as long as they are not discriminatory. Plaintiff has failed to put forth sufficient evidence of pretext to rebut Burger King's transfer decision. With regard to his termination, Plaintiff repeats that the written employee complaints are inadmissible. See footnote 3, *infra*. However, Plaintiff has failed to put forth any evidence of race discrimination in his termination. Summary judgment on his race discrimination disparate impact claim is therefore appropriate.

### 4.  Failure to Promote Claim

Plaintiff also asserts a claim for failure to promote him on account of race. To establish a prima facie case of Title VII race discrimination in a promotional decision, "a plaintiff must prove (1) that [he] is a member of a protected minority; (2) he was qualified and applied for the promotion; (3) he was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). This

standard has been interpreted to mean that the disparity in qualifications must be "so apparent as virtually to jump off the page and slap you in the face." Wilson, 376 F.3d at 1090 (citing Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)).

There appears to be an issue of fact as to whether Plaintiff even applied for a promotion above General Manager and whether he was rejected. Defendant denies that its management was aware of Plaintiff's application. Defendant also states that Plaintiff was in fact offered a CBM position in West Palm Beach, but turned it down because it was too far for him to commute. However, even assuming that there is a genuine issue of material fact dispute as to application and rejection, there is no genuine factual dispute that Plaintiff has failed to identify a non-black person (Kelly Elliott) who was promoted instead of Plaintiff and who had significant disparity in qualifications. The Court is reminded that the Eleventh Circuit has stated that courts "must not judge which employee was more qualified, but . . . determine whether any disparity. . . is so great that a reasonable fact-finder could infer that [Defendant] did not believe" that Elliott was better qualified. Wilson, 376 F.3d at 1090 (citing Cofield, 267 F.3d at 1268 (11th Cir. 2001)). Moreover, the "role of this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgment." Wilson, 376 F.3d at 1092, citing Lee, 226 F.3d at 1254. The Court therefore concludes that Plaintiff has failed to set forth a prima facie case because he has failed to provide sufficient evidence that he was not promoted in favor of someone substantially less qualified.

### C.  Retaliation

Defendant also seeks summary judgment as to Plaintiff's claim for retaliation.  To establish a prima facie case for retaliation, Plaintiff must show that: 1) he engaged in protected activity; 2) his employer was aware of that activity; 3) he suffered adverse employment action; and 4) there was a causal link between his protected activity and the adverse employment action.  <u>Maniccia</u>, 171 F. 3d at 1368.  "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to his protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed."  <u>Holifield v. Reno</u>, 115 F.3d 1555, 1566 (11th Cir. 1997) (quoting <u>Tipton v. Canadian Imperial Bank of Commerce</u>, 872 F.2d 1491, 1494 (11th Cir. 1989)).  "The plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff" and "[t]he employer's awareness of the statement may be established by circumstantial evidence."  <u>Holifield</u>, 115 F.3d at 1566 (citing <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993);  <u>Weaver v. Casa Gallardo, Inc.</u>, 922 F.2d 1515, 1524 (11th Cir. 1991)).  Once a prima facie case is shown, as with the race discrimination claim, if Defendant can show a legitimate business reason for the adverse action, then Plaintiff must show that the reason is pretexual.

In this case, there are two potential actions of protected activity raised by Plaintiff.  The first one is his complaint to Kelly Elliott in November of 2008 about what happened in Hilda Espinosa's room at the General Manager's Conference, and his related question to Elliott whether her managers were out of control.  However, the

neutral question by Plaintiff and his statement to Elliott are not necessarily "protected activity," since the underlying allegation may not have been an unlawful employment practice.  Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 856-57 (11th Cir. 2010).  Giving all possible inferences in favor of Plaintiff, one could construe his neutral question to Elliott as suggesting that the one incident could be part of a sexually hostile work environment, which would be an unlawful employment practice.  A separate hurdle for Plaintiff is that there is no evidence that Elliott told upper management or HR about his question.   Most importantly, there is no evidence of causation, as his transfer took place eight months after the comment to Elliott.  Thus, there is no temporal proximity between the two events.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.").  The Court concludes that Plaintiff has failed to put forth any genuine disputes of material fact regarding his prima facie case for retaliation as to his transfer.[4]

Plaintiff also alleges that his termination was retaliation for his filing of his charge of discrimination in July of 2009 (regarding his transfer).  Again, Plaintiff has failed to show causation, as the termination took place over nine months after his filing.  Other than Plaintiff's unsupported conspiracy theory that Brian Cunningham wanted to retaliate for Plaintiff's comment to Kelly Elliott (which took place 18 months prior to his termination), there is no evidence to support causation.  Even if there was, the

---

[4] Even if he could show a genuine dispute of material fact, as discussed above, Defendant has put forth a legitimate business reason for the transfer, and Plaintiff has failed to show pretext.

legitimate business reason for termination, the written employee complaints, combined with the lack of pretext, leads this Court to conclude that summary judgment in favor of Defendant is appropriate on the retaliation claims.

### III. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [DE 27] is hereby **GRANTED**;

2. Plaintiff's Motion for Summary Judgment [DE 30] is hereby **DENIED**;

3. Plaintiff's Motion to Redact Personal Identifiers [DE 44] is hereby **GRANTED**. The Clerk's office shall replace the appropriate pages (Exhibit E-4 in DE 30-2);

4. All other motions are **DENIED as moot**;

5. The Court will separately enter judgment for Defendant.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 3rd day of May, 2012.

_____
JAMES I. COHN
United States District Judge

copies to:

Steve Jefferson, pro se (via CM/ECF regular mail)

Rene Gonzalez-Llorens, Esq./Sheila Cesarano, Esq.